Decree of the Surrogate's Court of Kings county reversed and proceedings remitted to that court for settlement of the estate in accordance with the opinion of WOODWARD, J.

---

In the Matter of the Judicial Settlement of the Account of THE LONG ISLAND LOAN AND TRUST COMPANY, as Executor of the Last Will and Testament of DANIEL W. NORTHUP, Deceased, Appellant.

DWIGHT NORTHUP, Appellant; AMY NORTHUP and DANIEL W. NORTHUP, JR., Respondents.

*Surcharging an executor's account — a claim due to the estate lost by accepting for it real property with a defective title — delay in enforcing a claim until the Statute of Limitations has run against it — a clause of a will bequeathing a law business, books "and all property pertaining to my business" does not include a debt due to the testator for legal services — costs, when imposed upon an executor individually.*

On an accounting by the executors of Daniel W. Northup, a practicing lawyer, who died June 9, 1893, leaving a will by which he appointed the Long Island Loan and Trust Company his executor, it appeared that Northup and one Veeder had represented the Stewart estate in a litigation; that proceedings for

SECOND DEPARTMENT, MARCH, 1904.          [Vol. 92.

the settlement of the litigation were in progress at the time Northup died; that, pending negotiations for the settlement of the litigation, Northup and Veeder had a conversation, in which they agreed to accept the sum of $4,500 for their compensation, of which Northup was to receive $3,000 and Veeder was to receive $1,500; that Northup informed Veeder that the Stewart estate offered to convey, in part satisfaction of their claim, property known as the Clifton place, valued at $3,500; that Veeder expressed his willingness, if paid $1,000 in cash, to take a $500 interest in the real estate; that four days after Northup's death the parties to the litigation entered into an agreement of settlement, providing, " that there shall be paid to D. W. Northup, attorney for the contestants of said will of 1887, and William D. Veeder of counsel for their services up to and including settlement, the sum of four thousand and five hundred dollars;" that thereafter the Stewart estate paid $1,000 in cash, which was taken by Veeder, and conveyed the Clifton property to one Dooley, who executed a declaration that he held the same in trust for Veeder and the estate of Northup in the proportion of one-seventh and six-sevenths respectively; that the conveyance to Dooley was made with the consent of Northup's executor; that the title to the property conveyed was unmarketable and that that fact could have been discovered by Northup's executor with the exercise of reasonable care, but that no examination of the title was made.

It did not appear that Northup knew the condition of the title at the time he consented to take it in part satisfaction of his claim.

*Held*, that no adequate excuse existed for the action of the executor in accepting the Clifton place, without any proper examination of the title thereto, in satisfaction of the debt, and that the executor's accounts should be surcharged with the $3,000 which the estate had lost thereby.

It further appeared that at the time the testator died one Vosburgh was indebted to him in a considerable sum for legal services; that although this claim was mentioned in the inventory and was collectible the executor had made no effort to collect it and that the claim was at the time of the executor's accounting barred by the Statute of Limitations.

*Held*, that the executor's account was properly surcharged with the amount of this claim;

That Northup's claims against the Stewart estate and against Vosburgh for legal services did not pass under a clause of his will providing, " I give and bequeath to my son Dwight all my law business, law books, papers, safe, bookcases and office furniture, and all property pertaining to my business;"

That it was not improper for the surrogate, in the exercise of his discretion, to direct that the costs of the proceedings should be borne by the executor personally;

That, as a general rule, if an executor denies the existence of assets and such assets appear he will be personally charged with costs.

APPEAL by The Long Island Loan and Trust Company, as executor, etc., of Daniel W. Northup, deceased, and another, from a decree of the Surrogate's Court of the county of Kings, entered in

said Surrogate's Court on the 22d day of October, 1902, judicially settling the accounts of said executor.

*Joseph A. Burr,* for the appellant trust company.

*Dwight Northup,* appellant, in person.

*Augustus Van Wyck,* for the respondents.

HOOKER, J.:

Daniel W. Northup died on the 9th day of June, 1893, a practicing lawyer in the city of Brooklyn, leaving a last will and testament, in and by which he named the Long Island Loan and Trust Company as his executor; the will was duly probated by the surrogate of the county of Kings on the 13th day of September, 1893; the executor qualified and ever since that time has been acting as such. No accounting was ever had until the present proceeding. On the 3d day of July, 1900, the executor, by its secretary, verified a petition, praying that its account might be judicially settled. This was presented to the surrogate and was met with several objections, by William J. Courtney, as special guardian of two of the infant children of the deceased. Upon the matters in difference thus defined, a mass of testimony was taken, and the surrogate has surcharged the account of the executor with several thousand dollars. From the decree entered upon the findings of the surrogate, the executor and Dwight Northup, a son, have taken this appeal.

But three of the items of the executor's account are now open to dispute. The first is that known as the "Stewart" claim. In the year 1888 one James Stewart died, and his son filed a petition for the probate of a paper, dated in 1881, which purported to be the will of the deceased Stewart, and at the same time one Allaban filed a petition for the probate of another paper, dated in 1887, which purported also to be the last will of the deceased Stewart. Daniel W. Northup, the testator here, with William D. Veeder, as counsel appeared in these proceedings for James C. Stewart and others, and rendered legal services which covered a number of years and involved a large amount of arduous labor. The deceased and Veeder had been paid a considerable sum of money on account of their services in this matter; the litigation went through the late General Term, and was decided once in the Court of Appeals, and

SECOND DEPARTMENT, MARCH, 1904. [Vol. 92.

pending the contest, the widow of James Stewart died, leaving a will which was duly admitted to probate and letters testamentary issued thereon. After the widow died, the parties to the old contest agreed among themselves to avoid further litigation and expense, and to settle the matters in difference between them. A written agreement was drawn, dated the 1st day of June, 1893, signed by the parties interested in the estate of James Stewart, deceased, and acknowledged June 13, 1893, four days after the death of the testator in these proceedings. By this agreement it was determined and agreed between the parties what their several and individual interests in the estate of their testator should be, and the manner in which some of it should be turned over to the legatees. In that agreement appeared this clause : " That there shall be paid to D. W. Northup, attorney for the contestants of said will of 1887 and William D. Veeder of counsel, for their services up to and including settlement, the sum of four thousand and five hundred dollars." The proof introduced by the special guardian established that when this agreement was acknowledged, and for some time after the death of Mr. Northup, the estate of Stewart was solvent and well able to pay this claim of $4,500 in favor of Messrs. Northup and Veeder in full. On the 1st day of July, 1893, the executor of the Stewart estate conveyed a house and lot on Clifton place to one Dooley, who thereupon declared a trust in writing by which it was made to appear that he held title to the premises as trustee for the benefit of the estate of Daniel W. Northup, deceased, and of Mr. Veeder, the interest of the latter appearing to be one-seventh and of the former six-sevenths of the whole property. About that time $1,000 was paid in cash by the executor of the Stewart estate, which was taken by Mr. Veeder to apply on his interest of $1,500 in the $4,500 indebtedness of the Stewart estate to the deceased Northup and himself. Upon this accounting Mr. Veeder testified in relation to the talk between himself and the testator as to their compensation, as follows : " We (Mr. Daniel W. Northup and the witness) agreed upon the amount of compensation between us for the conclusion of the matter with the compromise and settlement with the parties Allaban and others, who were contesting the probate of the will that was admitted to probate, and after some conversation between us we agreed to accept the sum of $4,500 for our

compensation, of which Mr. Northup was to receive $3,000, and I was to receive $1,500. Mr. Courtney: Q. In what form were you to receive that? A. I think we had several conversations. Mr. Courtney: I have a right to know when this conversation took place. *This conversation must have been before that agreement was signed.* The conversation in regard to compensation was: Mr. Northup told me that there wasn't personal estate enough to pay us in cash, and he wanted to know how much — we had agreed upon the amount, and he wanted to know how much I wanted in cash, as there was some cash, and I told him I thought I ought to get $1,000 in cash. He told me they offered a piece of real estate at $3,500, I think, and I told him that I was willing, if I was paid the $1,000 in cash, to take $500 interest in the real estate, and I suggested to him that the property be conveyed to some trustee to hold for the benefit of himself and myself. It may be that we didn't agree upon that. It is possible that I took the title myself, and then sell it and give me my $500. He said he would accept the property at $3,500 if I would in that proportion. I was to have $500 and he was to have $3,000. That is the Clifton place property which was subsequently conveyed to Mr. Dooley. Mr. Dooley took the title."

It thus appears that the conversation between Messrs. Northup and Veeder in relation to the amount of their compensation to and including the settlement of the Stewart litigation, and the manner in which it should be paid, occurred before the agreement, from which we have quoted, was signed; that agreement, executed by the heirs of the Stewart estate, acknowledged in terms an indebtedness in this matter of $4,500, and thereafter the declaration of trust by Dooley was delivered to the attorney for the appealing executor, by him recorded, and the property on Clifton place was transferred to Dooley for the benefit of the estate it was administering *with its positive consent.* The title to the Clifton place premises is, however, conceded by all parties to be unmarketable for reasons it is unnecessary here to discuss. It is clear that this condition of the title could have been discovered by the executor at the time Mr. Dooley took the title with the exercise of reasonable care. There is evidence, however, tending to show that no examination of the title was made by any one at that time. Efforts have been made to dispose of this

SECOND DEPARTMENT, MARCH, 1904.                    [Vol. 92.

realty at the instigation of the appealing executor, Mr. Veeder and
Mr. Dooley, but they have all been unsuccessful on account of the
condition of the title, and it seems to be impossible to straighten
this title out during the lifetime of certain heirs at law and lega-
tees of Stewart, deceased. The excuse which the executor offers
for its consent to receive this Clifton place property in lieu of
cash from the Stewart estate, is that its testator had stated to Veeder
and Breaznell, managing clerk in the deceased's office, that he was
willing to accept the Clifton place property for $3,500 of the claim,
inasmuch as there was not money enough in the estate to pay the
cash. At the same time he said, however, that he would rather
have the money than the property, and this was prior to the prepara-
tion and execution of the written contract or agreement of settle-
ment between those interested in the Stewart estate. Nothing
appears in the voluminous record before us which even tends to
indicate that the deceased proposed to take a piece of property
whose title was not marketable, or that the condition of the title
had been called to his attention, and it is hardly to be believed that
had the testator lived he would have consummated an arrangement
by which he would be so likely to loose the benefit he was seeking
to derive as compensation for the arduous services he had rendered
in the Stewart will case.

But aside from that, there was no binding agreement or under-
standing of any kind between the testator and the representatives of
the Stewart estate that the Clifton place property should be taken
by Northup and Veeder in part payment of the services to which
they were entitled. On the contrary, it appears that subsequent to
the talk between the deceased and Veeder, in which the former sug-
gested the taking of this property, he prepared an agreement
between those interested in the Stewart estate, ultimately signed by
all of them, in which it was distinctly provided that the estate was
indebted to Northup and Veeder in the sum of $4,500, and no
mention is made there of the Clifton place property and no refer-
ence pointed to any other understanding, suggestion or contract that
the debt was to be paid by any other commodity than cash. All the
facts here stated could readily have been ascertained by the executor
of Mr. Northup's will if it had taken any steps to ascertain the truth
in relation to the indebtedness of the Stewart estate to Northup,

and we can find no adequate excuse anywhere in the record for the acceptance of real property in satisfaction of this debt. " Land should not be taken in payment of debts if its proceeds may be had instead." (Schouler Executors [3d ed.], § 310.) This principle is so well settled that it seems hardly necessary to cite further authorities in support thereof. In view of this rule, and in face of the obvious provisions of the written agreement, we are constrained to agree in the result reached by the learned surrogate, that the $3,000 which the estate has lost by reason of the conduct of the executor should be surcharged against its account.

The indifference of the executor toward this Stewart item is further evidenced by the negligent manner in which it has dealt with it since Dooley actually took the title and declared his trust in favor of Northup's estate and Mr. Veeder. Dooley collected rents for four years, and although there is in his hands a considerable balance of these rents, after paying lawful charges, the executor has never made any effort to collect this balance from him. And the same appears to be true of Mr. Veeder, who has since 1897 collected the rents; he has in his hands a considerable sum of money as proceeds of the rent.

The learned surrogate has found that $3,000, the share of the estate of Daniel W. Northup, deceased, in the claim of $4,500, could have been collected by the executor of the will of Daniel W. Northup, deceased, within one year after its appointment as such executor. There is abundant evidence to support that finding of fact and it cannot be disturbed on this appeal.

The second item of the executor's account in controversy is an indebtedness from one Vosburgh, to the deceased, for services rendered by the latter in his profession as a lawyer during his lifetime. Wright Duryea and William Duryea commenced an action against William C. Vosburgh in the year 1886 and the testator was retained and appeared for the defendant. This litigation was hard fought and extended over a period of time from the date of the commencement of the action until after the testator's death. On the first trial the jury disagreed; the second trial resulted in a verdict for the defendant. The late General Term affirmed the judgment entered upon the verdict, and on appeal to the Court of Appeals that court reversed the judgment and ordered a new trial. The

third trial likewise resulted in a verdict for the defendant, and from the judgment entered thereon, appeal again was taken to the General Term, which affirmed the judgment. The plaintiffs, unsatisfied, carried their case a second time to the Court of Appeals. Shortly before Northup died and in April, 1893, the judgment was again reversed by that court. The case was not tried again ; Mr. Vosburgh died in 1895, and his executors two years later settled with the plaintiffs for the sum of $2,000. The claim originally was for $6,000, which with interest from June 1, 1881, brought the alleged damages, at the time of the settlement, up to about $12,000. Of the fact that the testator rendered extremely valuable services to Mr. Vosburgh there can be no doubt ; one of the witnesses called by the special guardian has testified that the fair value of the legal services was $2,500, and this is not denied ; in his lifetime there was paid to Northup the sum of $534.32, and that the balance of $1,965.68 could have been collected from William C. Vosburgh within one year after the issuance of letters testamentary to the executor, the surrogate has found as a fact. Both Vosburgh and his estate were solvent, and this finding is supported by the evidence ; we are far from an inclination to interfere with it. The learned surrogate has also found that the executor has exercised no diligence in the collection of this claim, and inasmuch as the claim is now barred by the Statute of Limitations, all benefit to the estate from the services rendered by Northup in his lifetime to Vosburgh in the matter of this litigation is, therefore, lost. It does not appear that at any time within the seven years which elapsed between its qualification and the accounting, the executor made any appreciable effort to collect from Mr. Vosburgh or his estate remuneration for the services Northup rendered, and this although there appeared in the inventory an item of $1,687.87 costs in "Duryea v. Vosburgh, * * * suit still pending." The executor seemed to have been lulled to sleep by the statement of Breaznell, who had been managing clerk for Mr. Northup in his lifetime, that the judgment had been reversed in the Court of Appeals. A most casual examination could not have failed to disclose to the accounting executor a large amount of labor spent by the deceased in the conduct of this litigation ; the law register of Mr. Northup showed it, and counsel for the defendant, as well as the attorney for the plaintiffs and the plaintiffs them-

selves, would doubtless have corroborated the showing made by the register.

Upon the trial below the executor seems to have abandoned its theory that it was not negligent and has sought to show a full payment of this item by Vosburgh before his death.    We have examined the proof in this particular and are convinced that there is no such preponderance of the evidence showing that Mr. Northup had been paid in full as to call for a reversal of the surrogate's disposition of that item.

The only other item in dispute is that of eighty-eight dollars, paid by the executor to Joseph Breaznell for legal services. · It clearly appears that, in the service for which he was paid this sum, Breaznell was employed by Stewart A. Robinson, the executor of the Stewart will before referred to, and Breaznell testified that whatever he did with reference to the settlement was performed for the executors of the Stewart estate, and *not* for the estate of Northup, and that the attorney for this executor " left the closing to me, for I was acting for Stewart A. Robinson,    *    *    *    and I represented the Stewart estate *only* on this settlement."    The learned surrogate was, we think, quite correct in holding that the executor's account should be surcharged with this item, for it appears to be paid for legal services to a lawyer who was representing adverse parties.

This discussion leaves but one further matter to notice.    Dwight Northup, the eldest son of Daniel W. Northup, deceased, a child by the latter's first wife and a legatee and residuary beneficiary named in the will, has appealed from the decree of the surrogate, and makes the point that the claims for compensation for services which existed in favor of the deceased in his lifetime against the Stewart estate and Vosburgh passed to him under the will, and hence the appealing executor properly has had nothing to do with their collection, and no obligation rested upon it to exercise any degree of care or diligence in respect thereto.    It is very clear that Dwight Northup, appellant, and the executor, appellant, have adopted this view of the will but recently, and we think their former notion in respect to it was correct.    The 3d clause of the will reads as follows : " *Thirdly :* I give and bequeath to my son Dwight all my law business, law books, papers, safe, bookcases and office furniture, and all property pertaining to my business. · Also my stock certificate

in the Brooklyn Law Library, and the Ten Shares of Stock in the Lawyers' Title Insurance Company now pledged to the Company." The person named in that clause asks us to hold as matter of law that the two claims for legal services existing against the Stewart estate and against Vosburgh passed to him by reason of that clause. These debts were not mentioned in the clause, and it is impossible for the legatee named therein successfully to claim them, except on the theory that it was a devise by implication. It is said, however, that a gift by implication will only be adopted where the probability of such intention is so apparent that the contrary cannot be supposed to exist. (*Post* v. *Hover*, 33 N. Y. 593.) There is here nothing to support a claim for such contrary intention ; the son, Dwight, had not been admitted to the bar at the time of the preparation of the will, and was not admitted until some considerable period of time after his father's death. There is nothing to indicate a reason for any purpose in the mind of the testator to devise choses in action by language which describes choses in possession. The last will and testament of the deceased Northup was prepared by himself, a lawyer of large experience, and it may be presumed that he knew the effect generally of omitting to describe property the subject of devise. (*Walter* v. *Ham*, 68 App. Div. 381, 383.) *Matter of Reynolds* (124 N. Y. 388) is an authority against the contention of Dwight Northup upon this proposition. The testator there devised and bequeathed to his son certain real property upon which there were buildings, "including all the furniture and personal property in and upon the same, or in any manner connected therewith." The testator's office was on the property so devised, in which there was a vault containing money and securities, found upon his death. The Court of Appeals held that these securities were not bequeathed to the son under the provisions of the will, and, Judge Parker speaking, said (p. 397) : "We have now referred to the cases cited by the learned counsel for the appellant in support of his contention, and it will be observed that in every case, excepting *Hotham* v. *Sutton** and *Michell* v. *Michell*,† in which the court held that the general words preceding or following enumerated articles should not be limited to things *ejusdem generis*, they either occurred in a

---

*15 Ves. Jr. 319.                †5 Mad. 69.

general bequest of the whole of testator's estate, in a residuary clause, or the will did not contain a residuary disposition. With the exceptions thus noted, it seems to be a settled rule of construction that when certain things named are followed by a phrase which need not but might be construed to include other things, it will be confined to articles of the same general character as those enumerated. (*Johnson* v. *Goss*, 128 Mass. 434; *Dole* v. *Johnson*, 3 Allen, 364; *Spark's Appeal*, 89 Penn. 148\*.)"

The surrogate directed that the costs and expenses of this proceeding should be borne by the executor personally, and it is asked that we modify the decree so that it may be relieved of this burden. It was in the discretion of the learned surrogate whether the executor should be charged personally, and unless there has been an abuse of that discretion we may not interfere. (*Matter of Selleck*, 111 N. Y. 284.) We are not convinced that the surrogate abused his discretion; as far as the Vosburgh and the Stewart matters were concerned the executor has acted with great laxity and almost inexcusable negligence, although there is no intimation of any improper motive. Generally speaking, an executor will be directed personally to pay the costs where he denies assets, and they appear. (*Estate of Mull*, 16 N. Y. St. Repr. 981.)

The decree of the surrogate is in all respects proper and should be affirmed.

All concurred, except JENKS, J., not sitting.

Decree of the Surrogate's Court of Kings county affirmed, with costs.

---

\* *Sparks' Appeal* (89 Penn. St. 148).